ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
STEPHEN G. WOLFE (Cal. SBN: 116400)
E. MARTIN ESTRADA (Cal. SBN: 223802)
ELIZABETH R. YANG (Cal. SBN: 196461)
Assistant United States Attorneys
ANDREW CREIGHTON (Maryland State Bar Member)
Trial Attorney, U.S. Department of Justice
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-7408/3358/1785/7408
     Facsimile: (213) 894-3713
     Email:   Steve.Wolfe@usdoj.gov
              Martin.Estrada@usdoj.gov
              Elizabeth.Yang@usdoj.gov
              Andrew.Creighton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 11-72(A)-DDP |
| Plaintiff, | GOVERNMENT'S POSITION RE: PRE-SENTENCE REPORT AND SENTENCING OF HAYK KARAYAN (#5) |
| v. | |
| MHER DARBINYAN, et al., | |
| Defendants. | |

Plaintiff, by and through its attorney of record, the United States Attorney for the Central District of California, hereby files its position regarding the Presentence Report ("PSR") submitted by the United States Probation Office for defendant HAYK KARAYAN ("defendant").

///

///

1

The government's sentencing position is based on the attached memorandum of points and authorities, the PSR, the Declaration of Detective Eric Bixler, the attacked exhibits, the records and files of this case, and any argument that the Court may request at the sentencing hearing.  The government respectfully requests the opportunity to supplement its position as may become necessary.

Dated: May 27, 2014            Respectfully submitted,

                               ANDRÉ BIROTTE JR.
                               United States Attorney

                               ROBERT E. DUGDALE
                               Assistant United States Attorney
                               Chief, Criminal Division


                                    /s/
                               _____
                               STEPHEN G. WOLFE
                               E. MARTIN ESTRADA
                               Assistant United States Attorneys
                               ANDREW CREIGHTON
                               Trial Attorney, DOJ

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

# <u>TABLE OF CONTENTS</u>

<u>DESCRIPTION</u>                                                                         <u>PAGE</u>

TABLE OF AUTHORITIES..............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION..................................................1

II.   FACTS........................................................4

III.  ARGUMENT.....................................................8

      A.    THE MANDATORY MINIMUM SENTENCE.........................8

            1.    The Physical Evidence Shows Defendant Intended
                  at Least 1,000 Marijuana Plants.................10

            2.    Defendant's Statements Show that He Planned an
                  Ongoing Operation...............................13

            3.    Defendant's Arguments Are Misleading............17

      B.    THE SENTENCING GUIDELINES.............................17

            1.    Standard of Proof Applicable at Sentencing......17

            2.    The Guidelines Calculation......................19

      C.    SECTION 3553(a) FACTORS...............................22

IV.   CONCLUSION..................................................25

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                                    <u>PAGE</u>

**CASES:**

<u>Nichols v. United States</u>,
        511 U.S. 738 (1994)........................................ 18

<u>United States v. Armstead</u>,
        552 F.3d 769 (9th Cir. 2008)............................. 17

<u>United States v. Banuelos</u>,
        322 F.3d 700 (9th Cir. 2003)............................. 10

<u>United States v. Booker</u>,
        543 U.S. 220 (2005)........................................ 22

<u>United States v. Carty</u>,
        520 F.3d 984 (9th Cir. 2008)............................. 22

<u>United States v. Christensen</u>,
        732 F.3d 1094 (9th Cir. 2013)............................ 18

<u>United States v. Geevers</u>,
        226 F.3d 186 (3d Cir. 2000).............................. 21

<u>United States v. Reed</u>,
        575 F.3d 900 (9th Cir. 2009)............................. 10

<u>United States v. Riley</u>,
        335 F.3d 919 (9th Cir. 2003)............................. 18

<u>United States v. Robinson</u>,
        35 F.3d, 442 (9th Cir. 1994)............................. 17

<u>United States v. Strozier</u>,
        981 F.2d 281 (7th Cir. 1992.............................. 21

<u>United States v. Thomas</u>,
        355 F.3d 1191 (9th Cir. 2004)............................. 9

<u>United States v. Torres</u>,
        209 F.3d 308 (3d Cir. 2000).............................. 21

<u>United States v. W. Coast Aluminum Heat Treating Co.</u>,
        265 F.3d 986 (9th Cir. 2001)............................. 20

**STATUTES:**

18 U.S.C. § § 3553(a)........................................ 22

18 U.S.C. § 3661 (A)..................................... 19, 20

21 U.S.C. § 841(b)(1)(A)...................................... 8

**RULES:**

Fed. R. App. P. 32.1(a)..........................................18

Fed. R. Evid. 1101(d)(3).........................................18

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

On February 11, 2013, defendant HAYK KARAYAN ("defendant") pled guilty to Counts 1 and 118 of the First Superseding Indictment ("Indictment"), charging Racketeering Conspiracy, in violation of Title 18, United States Code, Section 1962(d), and Conspiracy to Manufacture and Possess with Intent to Distribute Marijuana, in violation of Title 21, United States Code, Section 846.

In addition to the factors set forth in Title 18, United States Code, Section 3553(a), there are two main aspects to defendant's sentencing: the applicable statutory mandatory minimum sentence and the applicable Sentencing Guidelines offense level.

With regard to the applicable statutory mandatory minimum sentence, defendant admitted in his plea agreement that his conspiracy involved at least 100 marijuana plants, thus triggering a 5-year mandatory minimum sentence under Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B). See Plea Agreement ¶ 6. Although defendant disputed that his conspiracy involved at least 1,000 marijuana plants, which would result in a 10-year mandatory minimum sentence under Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), defendant agreed to "waive[] his right to have the government prove beyond a reasonable doubt" that the conspiracy involved at least 1,000 marijuana plants. See Plea Agreement ¶ 6. Instead, defendant agreed that the Court would make the determination, by a preponderance of the evidence, as to whether the conspiracy involved at least 1,000 marijuana plants. See Plea Agreement ¶ 6.

As described below, the evidence shows that the defendant's conspiracy involved at least 1,000 marijuana plants.  The defendant possessed 567 marijuana plants at the time of the seizure in April 2010.  But that was merely a snapshot of defendant's overall marijuana operation.  The Lankershim facility was designed and set up to produce approximately 150 flowering marijuana plants every 60 days, as it had two flowering rooms operating on alternating 30-day cycles.  Moreover, the Lankershim facility had a third room for producing cloned marijuana plants, which would root after approximately a week, and replace the harvested marijuana plants from the flowering rooms.  Because the Lankershim facility involved a significant investment, costing tens of thousands of dollars to set up, and because the facility yielded significant returns, producing $200,000 worth of marijuana every 60 days, the conspirators had every incentive to continue operating the facility.

Defendant's recorded calls bear out his intent to maintain and continue his marijuana operation for the long term.  In his calls, defendant repeatedly referred to acquiring and possessing additional marijuana growing facilities, and discussed expanding the conspiracy's marijuana growing activities.  Taken together, the physical evidence and defendant's statements establish by a preponderance that the conspiracy involved more than 1,000 marijuana plants.

With regard to the Sentencing Guidelines, on April 9, 2013, the United States Probation Office ("USPO") disclosed to the parties its Presentence Report ("PSR") in this matter.  The USPO determined that defendant's Sentencing Guidelines base offense level is 6 under U.S.S.G. §§ 2B1.1(a)(2), 2E1.1(a)(2), that he is subject to a 12-

level upward adjustment for loss of more than $200,000 under U.S.S.G. § 2B1.1(b)(1)(G), that he is subject to a 2-level upward adjustment for a scheme involving sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C), that he is subject to a 2-level upward adjustment for device-making equipment under U.S.S.G. § 2B1.1(b)(11)(A), that he is subject to a 4-level upward adjustment for aggravating role pursuant to U.S.S.G. § 3B1.1(a), that he is subject to a 2-level multiple count adjustment under U.S.S.G. § 3D1.4, and that he is eligible for a 3-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1, for a total offense level of 25. (See PSR ¶¶ 29-36.) Coupled with defendant's criminal history category of Category II, (see PSR ¶¶ 56-57), these calculations result in a Sentencing Guidelines range of imprisonment of 63 to 78 months. (See PSR ¶ 88.)

The government agrees with the USPO's calculations, but believes that defendant's intended loss amount is greater, such that a 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H) is therefore applicable, resulting in a total offense level of 28. This calculation results in a Sentencing Guidelines range of imprisonment of 78 to 97 months.

Regardless of the Sentencing Guidelines, because defendant is subject to a 10-year mandatory minimum sentence, the government recommends that, pursuant to the mandatory minimum sentence and the factors set forth in Title 18, United States Code, Section 3553(a), defendant should be sentenced to 120 months incarceration, to be followed by five years' supervised release, and a special assessment of $200.

///

II.  **FACTS**

Beginning on a date unknown, and continuing to in or around January 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendant was a member of the Armenian Power criminal enterprise ("Armenian Power").  As a member or associate of Armenian Power, defendant conspired and agreed with co-defendants named in Count One of the Indictment, and others, to conduct and participate in the affairs of Armenian Power through a pattern of crimes including robbery, extortion, conspiracy to traffic in controlled substances, and other offenses.  (See Plea Agreement ¶ 14.)

In addition, beginning on a date unknown and continuing to on or about January 26, 2011, in Los Angeles, within the Central District of California, and elsewhere, defendant agreed and conspired with at least one other person charged in Count One Hundred and Eighteen of the Indictment to knowingly and intentionally manufacture, and possess with intent to distribute, a controlled substance, namely, marijuana plants.  Defendant became a member of the conspiracy knowing of its objects of manufacturing, and possessing with intent to distribute, marijuana plants, and intending to help accomplish those objects.  (See Plea Agreement ¶ 14.)

For the purpose of associating with Armenian Power, and participating in the affairs of Armenian Power, and agreeing that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of Armenian Power, and for purposes of intending to further the conspiracy to manufacture and possess with

4

intent to distribute marijuana plants, defendant committed numerous acts, including, among other things, the following:

Identity Theft and Access Device Fraud Using the Saticoy Location

On or about January 16, 2010, defendant discussed with co-defendant RAYMOND TARVERDYAN ("TARVERDYAN") the need to get their fraudulent business going so that they could make some money. On or about January 21, 2010, defendant discussed with TARVERDYAN that they had six individuals ready to work on their financial fraud business and discussed the need to rent office space. (See Plea Agreement ¶ 14.)

On or about January 25, 2010, defendant discussed with co-defendant GAGIK ZHAMKOCHYAN ("ZHAMKOCHYAN") using a location on Saticoy Street in North Hollywood for their financial fraud business, and defendant instructed ZHAMKOCHYAN to contact co-defendants ARMAN KARAYAN ("A. KARAYAN") and KARAPET JOEY KARAMUSYAN ("KARAMUSYAN") regarding activities at the Saticoy location. (See Plea Agreement ¶ 14.)

On or about January 25, 2010, defendant discussed with KARAMUSYAN individuals whom they could pay in exchange for use of their identities in fraudulent activity. (See Plea Agreement ¶ 14.)

On or about January 27, 2010, defendant discussed with ZHAMKOCHYAN moving into the office space at Saticoy and that KARAMUSYAN and co-defendant HAROUTIOUN ARTHUR MELKONIAN ("MELKONIAN") would also be there. On or about January 27, 2010, co-defendants A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, and MELKONIAN went to the office at the Saticoy location. (See Plea Agreement ¶ 14.)

On or about February 1, 2010, TARVERDYAN asked defendant when they should go to the office at Saticoy and make some money.  On or about February 3, 2010, defendant went to the office at the Saticoy location.  (See Plea Agreement ¶ 14.)

On or about February 10, 2010, defendant, A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, and MELKONIAN possessed, among other things, the following at the Saticoy location:  pre-paid telephone cards, marked with their names, for their use in connection with the financial fraud business; rubber fingerprint covers to prevent their fingerprints from appearing on the documents and items inside the Saticoy location; a "reader-writer" device used to re-encode the magnetic strips on access devices, such as credit and debit cards; and "skimming devices" used to collect means of identification, including account numbers, from gas station pumps.  (See Plea Agreement ¶ 14.)

### Conspiracy to Manufacture and Possess with Intent to Distribute Marijuana Plants

In or around January 2010, co-defendant ARSEN AYRANJIAN ("AYRANJIAN") took care of marijuana plants being grown at the marijuana facilities operated by defendant and others.  On or about January 14, 2010, defendant discussed with TARVERDYAN starting a marijuana grow and finding workers to help cultivate the marijuana plants.  On or about January 15, 2010, defendant discussed with A. KARAYAN purchasing plant fertilizer for growing marijuana plants. On or about January 16, 2010, defendant discussed with co-defendant ZHIRYAR KARAYAN ("Z. KARAYAN") drying, packaging, and labeling marijuana.  (See Plea Agreement ¶ 14.)

On or about January 16, 2010, defendant discussed with co-defendant JACK GAMBARYAN ("GAMBARYAN") growing marijuana, and defendant said he had moved marijuana plants into his house.  On or about January 17, 2010, defendant told Z. KARAYAN to instruct AYRANJIAN to go to defendant's marijuana facility, water the plants, and make sure to vacuum carefully at the location.  (See Plea Agreement ¶ 14.)

On or about January 21, 2010, defendant discussed with GAMBARYAN looking for another marijuana grow location.  On or about January 22, 2010, defendant discussed with Z. KARAYAN obtaining larger locations to grow marijuana, including one location that already had 150 marijuana plants inside of it.  On January 22, 2010, defendant discussed with A. KARAYAN a person who had a warehouse of marijuana plants for sale for $25,000, and defendant said it was a good deal.  (See Plea Agreement ¶ 14.)

On or about February 8, 2010, defendant told an unindicted co-conspirator that defendant had high quality marijuana available at $1,100 to $1,200 dollars for 12 ounces.  On or about February 8, 2010, defendant told an unindicted co-conspirator that defendant would need 200 clone marijuana plants for one of his marijuana grow locations, and 200 marijuana clone plants for another marijuana grow location.  On or about February 8, 2010, defendant told co-defendant ROMAN TEROGANESYAN that defendant had three marijuana grow sites operating and was opening a fourth, and that each grow site consisted of at least 150 marijuana plants.  (See Plea Agreement ¶ 14.)

On or about February 10, 2010, defendant possessed approximately 2.38 kilograms of marijuana, a firearm, namely, a

Beretta model 96 .40 caliber semi-automatic pistol, and ammunition, at his residence at 18536 Brasilia Drive, in Northridge, California. (See Plea Agreement ¶ 14.)

On or about April 26, 2010, GAMBARYAN brought a propane tank and bamboo stakes to a marijuana growing facility that defendant, A. KARAYAN, GAMBARYAN, GRIGOR GARIBYAN, ARAM KHACHATRYAN ("A. KHACHATRYAN"), Z. KARAYAN, and HOVANNES IGARIAN were operating at 8239 Lankershim Boulevard, Unit D, in North Hollywood, California (the "Lankershim facility"). Later, defendant, GARIBYAN, A. KHACHATRYAN, and Z. KARAYAN met inside the Lankershim facility. Inside the Lankershim facility, defendant and his co-defendants possessed approximately 567 marijuana plants, as well as equipment used to grow marijuana, including one-gallon and five-gallon pots containing potting soil, high wattage overhead light bulbs with reflector shades, air conditioning units, dehumidifier units, fans, carbon filter systems, watering tubs, a submersible pump, and a carbon dioxide generator attached to a propane tank. (See Plea Agreement ¶ 14.)

## III. ARGUMENT

### A.   THE MANDATORY MINIMUM SENTENCE

Under Title 21, United States Code, Sections 841, a defendant is subject to a 10-year mandatory minimum sentence if his drug-trafficking offense involved at least 1,000 marijuana plants, and is subject to a 5-year mandatory minimum sentence if his drug-trafficking offense involved at least 100 marijuana plants. See 21 U.S.C. § 841(b)(1)(A)-(B).

In his plea agreement, defendant, after being apprised of the different potential mandatory minimum sentences, admitted that he

8

1  "in fact, conspired to manufacture and possess with intent to

2  distribute at least 100 marijuana plants."  See Plea Agreement ¶ 6.

3  Although he stated that he disputes that his conspiracy involved at

4  least 1,000 marijuana plants, defendant "agree[d] that the

5  determination as to whether or not he conspired to manufacture and

6  possess with intent to distribute at least 1,000 marijuana plants

7  will be determined by the Court by a preponderance of the evidence."

8  See Plea Agreement ¶ 6.

9      Although drug-quantity must normally be determined by a jury

10  beyond a reasonable doubt, United States v. Thomas, 355 F.3d 1191,

11  1195 (9th Cir. 2004) ("[D]rug type and quantity are not elements of

12  the offense, but rather are material facts that must be submitted to

13  the jury and proved beyond a reasonable doubt."), defendant in his

14  plea agreement "waive[d] his right to have the government prove

15  beyond a reasonable doubt that defendant conspired to manufacture or

16  possess with intent to distribute at least 1,000 marijuana plants,

17  defendant waive[d] his right to have this fact determined by a jury,

18  and defendant consent[ed] to have the Court make this

19  determination."  See Plea Agreement ¶ 6.  Defendant understood

20  "that, if the Court finds, by a preponderance of the evidence, that

21  defendant conspired to manufacture and possess with intent to

22  distribute at least 1,000 marijuana plants, defendant will be

23  subject to . . . a ten-year mandatory minimum sentence."  See Plea

24  Agreement ¶¶ 6; see also Plea Agreement ¶ 16.

25      The Ninth Circuit has held that, in determining drug type and

26  amount, for purposes of "sentencing under the statute of offense," a

27  conspirator is liable for the type and quantity of "drugs that

28  either (1) fell within the scope of the defendant's agreement with

9

his coconspirators or (2) was reasonably foreseeable to the defendant." United States v. Banuelos, 322 F.3d 700, 704 (9th Cir. 2003); see also United States v. Reed, 575 F.3d 900, 925 (9th Cir. 2009) ("[A drug] conspirator is to be judged on the quantity of drugs that he reasonably foresaw or which fell within the scope of his particular agreement with the conspirator.").

The evidence establishes that defendant agreed with his co-conspirators to manufacture and possess with intent to distribute 1,000 or more marijuana plants, and that it was reasonably foreseeable to the defendant that the conspiracy would do so. The evidence consists of admissions made in defendant's plea agreement, defendant's recorded statements, and the physical evidence.

1. The Physical Evidence Shows Defendant Intended at Least 1,000 Marijuana Plants

On April 26, 2010, at the Lankershim facility, defendant was found in possession of approximately 567 marijuana plants, and a fully loaded marijuana grow containing everything needed to manufacture marijuana, including one-gallon and five-gallon pots containing potting soil, 20 sets of power ballasts, lamp shades, and high-powered light bulbs, air conditioning units, dehumidifier units, fans, carbon filter systems, watering tubs, a submersible pump, and a carbon dioxide generator attached to a propane tank. (See Plea Agreement ¶ 14; Ex. 1, at 5, 10-11 (Police Report).)

The Lankershim facility consisted of three separate functioning marijuana grow rooms. Of the three marijuana rooms, two were flowering rooms that contained marijuana plants at different stages of growth, indicating that they were operating in an alternating cycle, with one of the two rooms being harvested every 30 days.

10

(See Declaration of Det. Eric Bixler ("Bixler Decl") ¶ 3; Ex. 1 at 5-6; Ex. 2 (Photographs).)  Once harvested, the plants would be destroyed and then replaced with fresh adolescent plants.  (See Bixler Decl ¶ 2.)  The combined capacity of these two rooms was approximately 150 plants every 60 days.  In addition to the mature plants in the two flowering rooms, the Lankershim facility also contained a room for the preparation and growing of cloned cuttings from mature plants.  At the time of the seizure, that room contained approximately 219 plant clones set in 1 inch cubes of growing material for rooting, a process that takes just a few days.  (Ex. 1 at 5-6.)  That room also contained approximately 136 plants entering the adolescent stage and 22 plants from which cuttings would be taken.  Given the number of plant clones found there, this room contained significantly more plants than either of the two flowering rooms could contain.  (Ex. 1 at 5-6)

The marijuana growing site was sophisticated, using timers and generators to grow the marijuana in a cycle, that is, to have a constant supply of marijuana available to be harvested.  (See Bixler Decl. ¶ 3; Ex. 1 at 5-6; Ex. 2.)  Establishing such a sophisticated operation at the Lankershim facility required a substantial investment.  (See Bixler Decl. ¶¶ 4-5.)  Defendants discussed the significant investment that had been made in their marijuana cultivation conspiracy in telephone calls.  On February 3, 2010, defendant discussed temperature control, which was supplied by $200 vents:

    HK:    But if they're gonna get the trays, let them get some vent fans too, bro.  We need like four vent fans. Those are like 200 bucks each.

(<u>See</u> Ex. 6, Call 1070 on 2/3/2010, at 4.)  Later in the same call, defendant described his intent to use digital air conditioning units:

> HK:    **Later on in the future**, we — we're gonna need to change up that A/C, bro, that A/C is just cooling. We need a heater.  We need a cooler, heater.  Do you see?  There are digital units, it's like 300 buck — 300 bucks for like a one ton.

(<u>See</u> Ex. 6, Call 1070 on 2/3/2010, at 5 (emphasis added).)

The time, money, planning, and effort required to establish the facility supports the conclusion that the facility was intended to be used for the production of more than one crop.  When individuals involved in the cultivation of marijuana invest significant time and resources in establishing a marijuana grow site, those locations will typically operate for extended periods of time.  (<u>See</u> Bixler Decl. ¶¶ 4-5.)  Because marijuana is valuable, individuals involved in the cultivation of marijuana will typically operate a marijuana grow for as long as possible.  (<u>See</u> <u>id.</u> ¶ 5.)

Furthermore, the Lankershim facility's very set up shows that it was intended to operate continually.  The Lankershim facility operated on a cycle, with clone plants being nurtured and developed in order to be placed in flowering rooms.  (<u>See</u> <u>id.</u> ¶ 3.)  The plants would then be harvested every 60 days.  (<u>See</u> <u>id.</u>)  The 567 marijuana plants found at the Lankershim facility on the day it was seized was just a snapshot of the overall marijuana growing operation.  The facility was designed to operated continually and generate new marijuana plants every 30 days, and it was set up to

12

produce $200,000 worth of marijuana and at least 150 new plants every 60 days.  (See id. ¶ 4.)

Accordingly, both in its substantial investment and design for continual use and production, the Lankershim facility would certainly have produced well over 1000 plants if it had been allowed to continue its operation.  The physical evidence, then, shows that defendant intended the conspiracy to include at least 1,000 marijuana plants.

2.  Defendant's Statements Show that He Planned an Ongoing Operation

The evidence also shows that defendants planned an ongoing operation.  On February 8, 2010, defendant told an unindicted co-conspirator that defendant would need 200 clone marijuana plants for one of his marijuana grow locations, and 200 marijuana clone plants for another marijuana grow location.  (See Plea Agreement ¶ 14.) That same day, defendant told co-defendant ROMAN TEROGANESYAN that defendant had three marijuana grow sites operating and was opening a fourth, and that each grow site consisted of at least 150 marijuana plants.  (See Plea Agreement ¶ 14.)  Combined with the 567 marijuana plants found at the Lankershim facility, and even assuming one of the four sites that defendant discussed was the Lankershim facility, three other grow sites containing 150 or more plants would meet the 1,000 marijuana-plant threshold.

Furthermore, additional evidence showed that defendant intended his marijuana operation to be ongoing.  On February 10, 2010, defendant possessed at his house, in addition to approximately 2.38 kilograms of marijuana, a firearm, and ammunition, a marijuana

13

growing facility set up at his home.  (See Ex. 3 (Photographs of Search).)

    Additionally, in a call on February 3, 2010, defendant planned the choice of future containers and indicated that the first crop would not be their last:

HK:    But . . . for this first one we'll just use those
       buckets that he's got.  After that, **next time**, we'll
       use the pots.  Like real pots.

(See Ex. 6, Call 1070 on 2/3/2010, at 7 (emphasis added).)

    Growing the marijuana required installation of high-wattage lights.  Defendant discussed those lights, stated that multiple rooms were to be used, and again acknowledged the future orientation of the conspiracy:

HK:    We don't need as many lights.  I will put those three
       along with those five and it will make it eight.
       I'll split four-four on either side —

JG:    Yeah.

HK:    — so that one room will be done.  The other one has
       four . . . We need four more.

JG:    OK.

HK:    OK?  We don't need it right at this moment, **'cause
       like we could do that later.  You know what I mean?**

(See Ex. 6, Call 1070 on 2/3/2010, at 4 (emphasis added).)

    Together with defendant's statements about "later," "next time," and "later on in the future," there is sufficient evidence to conclude that the conspirators intended to grow multiple crops.

1    In a February 8, 2010 call, defendant also stated his need for

2  additional seedlings and indicated the continuing nature of his

3  requirements:

4        HK:  OK bro.  **I need like 200 in like a month.**

5        NA:  In a month? Okay.

6        HK:  Yeah.  That's for one of my locations.  **And then in a**

7             **month after that I'll need about . . . about 200**

8             **more.**

9  (See Ex. 7, Call 1202 on 2/8/2010, at 3 (emphasis added).)

10   Moreover, defendant also stated that he planned to expand the

11  operation to another location:

12       HK:  later on if — yeah-yeah . . . It's just later one . .

13            . Look bro, now my situation is like . . . **Now I have**

14            **to get a place, whether I want it or not.**  You know

15            what I mean?  **I gotta go do it,** but it's just too

16            much work for my dad and Arsen to handle.  You see?

17            Myself, my dad and Arsen . . . That's . . . 165 trees

18            is no joke, bro.

19       JG:  Yeah.

20       HK:  Now, **I have to start a second place.** . . .

21  (See Ex. 6, Call 1070 on 2/3/2010, at 6 (emphasis added).)

22   In a conversation with his father, defendant indicated his

23  intent to continue in and to expand operations, discussing

24  laboratory analysis of their marijuana, the possibility of patenting

25  their marijuana strains, and the counties they should operate in.

26  Moreover, they discussed making an annual salary of $250,000 from

27  their marijuana operations, and using a second "non-profit"

28

15

corporation to make a second $250,000 annually.  (<u>See</u> Ex. 8, Call 396 on January 21, 2010, at 1-2 (line sheet).)

Defendant repeatedly demonstrated that he planned a long term operation.  In a call on January 21, 2010, defendant discussed the possibility that marijuana dispensaries might be closed under a new Los Angeles ordinance.  Defendant stated that the ordinance would not interfere with the operation for "[t]wo years, three years." (<u>See</u> Ex. 9, Call 775 on January 27, 2010, at 5.)  Defendant then indicated that he planned to continue the marijuana growing operation without regard to its legality:

> HK:   [UI] it will always be . . . Nothing will happen
>        to that.  ***If it is not there, it will go to the
>        streets.  If it doesn't go to the streets, it will
>        go to somewhere else.***

(<u>See</u> Ex. 9, Call 775 on January 27, 2010, at 6-7.)  And in that call defendant again stated that the operation would involve multiple crops:

> HK:   So . . . that's it in general, dear.  There is
>        nothing big . . .  It's not like anything too bad.
>        No.  We will still manage to start in one or two
>        places.  ***We will do two three rounds to see what
>        happens.***

(<u>See</u> Ex. 9, Call 775 on January 27, 2010, at 5.)

Defendant's own statements, therefore, further demonstrate that defendant intended to operate an ongoing and continuing conspiracy for years, and that defendant intended the conspiracy to be expansive, including numerous facilities.  Thus, defendant should be

found to have intended that his conspiracy involve at least 1,000 marijuana plants.

### 3. Defendant's Arguments Are Misleading

Against this defendant objects that the evidence of multiple locations is insufficient, but fails to consider defendant's own statement, "Now, I have to start a second place." (Ex. 6, Call 1070 on 2/3/2010, at 6.)  Defendant also argues that the evidence does not show that the Lankershim facility would have been used for more than a single crop, (Def. Pos. on PSR, CR 3246, at 9.), but fails to consider not only defendant's statements but the alternating growing cycles in the two flowering rooms.  Defendant further claims that it would have taken almost two years to grow 1,000 plants to maturity, (id. at 10), but fails to consider the rapid production capabilities of the cutting room.  Finally, defendant argues that the Lankershim facility was too small to grow more than 741 plants to maturity, (id. at 11), but ignores the fact that rooted cuttings in 1-inch blocks, such as those contained in the grow room, qualify as marijuana plants under United States v. Robinson, 35 F.3d, 442, 446 (9th Cir. 1994).

Defendant's arguments therefore do nothing to undercut the weight of the evidence here, which shows that defendant intended to produce multiple crops, in multiple locations, and that would result in the manufacture and possession with intent to distribute of more than 1,000 plants.

### B. THE SENTENCING GUIDELINES

### 1. Standard of Proof Applicable at Sentencing

The Ninth Circuit has been clear that when a Sentencing Guidelines enhancement is based on the scope of "criminal activity

for which the defendant has already been convicted," a preponderance standard applies. United States v. Armstead, 552 F.3d 769, 777 (9th Cir. 2008). Indeed, the Ninth Circuit has repeatedly applied a preponderance standard in determining sentencing enhancements under U.S.S.G. § 2B1.1, even when those enhancements are substantial. See id. (applying preponderance standard to loss and victim enhancements under U.S.S.G. § 2B1.1); United States v. Riley, 335 F.3d 919, 926-27 (9th Cir. 2003) (applying preponderance standard to loss enhancement under U.S.S.G. § 2B1.1); see also United States v. Johnson, 540 Fed. Appx. 573, 576-77 (9th Cir. 2013)[1] (applying preponderance standard to 16-level loss enhancement and 2-level victim enhancements under U.S.S.G. § 2B1.1).

Further, with regard to determinations of facts for purposes of sentencing, the Ninth Circuit has explained, "The Federal Rules of Evidence do not apply at a sentencing hearing." United States v. Christensen, 732 F.3d 1094, 1102 (9th Cir. 2013) (citing Fed. R. Evid. 1101(d)(3)); see also U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). "Indeed, 'a sentencing judge may appropriately conduct an inquiry broad in

---

[1] Pursuant to Federal Rule of Appellate Procedure 32.1, "a court may not prohibit or restrict the citation of federal judicial opinions" that have been designated unpublished but "issued on or after January 1, 2007." Fed. R. App. P. 32.1(a). Under Ninth Circuit Rule 36-3, unpublished dispositions "issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1."

18

1    scope, largely unlimited either as to the kind of information he may

2    consider, or the source from which it may come.'" Id. (quoting

3    Nichols v. United States, 511 U.S. 738, 747 (1994)). Federal law

4    expressly provides that "[n]o limitation shall be placed on the

5    information concerning the background, character, and conduct of a

6    person convicted of an offense which a court of the United States

7    may receive and consider for the purpose of imposing an appropriate

8    sentence." See 18 U.S.C. § 3661.

9        2.    The Guidelines Calculation

10       The USPO determined that defendant's Sentencing Guidelines base

11   offense level is 6 under U.S.S.G. §§ 2B1.1(a)(2), 2E1.1(a)(2), that

12   he is subject to a 12-level upward adjustment for loss of more than

13   $200,000 under U.S.S.G. § 2B1.1(b)(1)(G), that he is subject to a 2-

14   level upward adjustment for a scheme involving sophisticated means

15   under U.S.S.G. § 2B1.1(b)(10)(C), that he is subject to a 2-level

16   upward adjustment for device-making equipment under U.S.S.G. §

17   2B1.1(b)(11)(A), that he is subject to a 4-level upward adjustment

18   for aggravating role pursuant to U.S.S.G. § 3B1.1(a), and that he is

19   eligible for a 3-level downward adjustment for acceptance of

20   responsibility under U.S.S.G. § 3E1.1, for a total offense level of

21   26. (See PSR ¶¶ 29-36.) Coupled with defendant's criminal history

22   category of Category II, (see PSR ¶¶ 56-57), these calculations

23   result in a Sentencing Guidelines range of imprisonment of 63 to 78

24   months. (See PSR ¶ 88.)

25       The government agrees with the USPO's calculations, but

26   believes that, defendant's intended loss amount is greater, such

27   that a 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H) is

28   applicable. Under the Sentencing Guidelines, "loss" is defined as

19

1  "the greater of actual loss or intended loss." See U.S.S.G. §

2  2B1.1, cmt. n.3(A).  "Intended loss" is defined as "the pecuniary

3  harm that was intended to result from the offense," and "includes

4  intended pecuniary harm that would have been impossible or unlikely

5  to occur." Id. § 2B1.1 cmt. n.3(A)(ii).  In determining loss, the

6  district court "need only make a reasonable estimate of the loss."

7  Id. § 2B1.1 cmt. n.3(C); United States v. W. Coast Aluminum Heat

8  Treating Co., 265 F.3d 986, 991 (9th Cir. 2001) ("[T]he district

9  court's obligation is to adopt a reasonable 'realistic, economic'

10  projection of loss based on the evidence presented.").

11  　　　Here, the facts show an intended loss greater than $400,000.

12  Defendant and his co-defendants, falsely claiming they were running

13  a food pickling business, leased space at Saticoy.  Defendant and

14  his co-schemers possessed at Saticoy prepaid phone cards,

15  fingerprint covers to keep their finger prints off of documents, a

16  device to re-encode the magnetic strips of access devices, a

17  skimming device to illegally collect means of identification,

18  including account numbers, from gas station fuel pumps.  They also

19  possessed bank account information for several individuals whose

20  bank accounts contained approximately $750,233. (See Ex. 4 (Chart

21  Re: Saticoy Bank Account Information).)[2]  Additionally, they

22  possessed 25 cards re-encoded with victims' account information, and

23  credit-card information for various victims with available credit

24  ───────────────────

25  　　　[2] Moreover, in addition the specific account numbers possessed
    by defendant (which contained $750,233 in available funds),

26  defendant possessed information for victims who had other accounts
    that had additional funds in them.  Defendant possessed personal

27  information for these victims at the same banks where the additional
    accounts and funds were located, and thus, could have easily

28  accessed those other accounts as well.  If those additional accounts
    are included, the total available funds would be $1,055,147.

lines worth over $50,000.  (See Ex. 5 (Chart Re: Saticoy Fraud Credit Cards).)

The common sense inference from the proof of the fraud materials possessed by defendant supports an intended loss amount of over $400,000.  Defendant admitted that he and his co-defendants intended to carry out a fraud scheme at the Saticoy location.  With this admission, a showing that defendant had the capability to access bank accounts holding more than $400,000 supports the common sense inference that the admitted fraudsters intended to take all the money they could get, until caught or otherwise stopped, since greed is the motive for the offense.  The case law supports this common sense conclusion:  "The district court could reasonably infer that the defendant intended to withdraw more than $36,000 from his accounts, and would have had he not been apprehended.  Only his arrest prevented Strozier from spending the rest of the fraudulently deposited funds."  United States v. Strozier, 981 F.2d 281, 284(7th Cir. 1992)(finding intended loss equaled all the phony checks deposited in bank account, not only the amount actually withdrawn).  "It was eminently reasonable for the District Court to infer that Torres intended to withdraw the balance of the deposits before the stolen check surfaced as stolen and would have done so had he not been arrested."  United States v. Torres, 209 F.3d 308, 312 (3d Cir. 2000) (affirming finding of intended loss equal to all checks deposited, not only the amount withdrawn).  "Though he may not have expected to get it all, he could be presumed to have wanted to."  United States v. Geevers, 226 F.3d 186, 193 (3d Cir. 2000)(affirming intended loss of all phony checks deposited, not only the amount actually withdrawn).

The common sense conclusion is also supported by the Sentencing Guidelines, which directs that the court "need only make a reasonable estimate of the loss." See U.S.S.G. § 2B1.1 cmt. n.3(C). Once the "government has adequately proven that the defendants had enough information and equipment to cause losses of more than $400,000," (PSR ¶ 30), the government submits that a reasonable estimate of the intended loss is that defendant, who has admitted that the intended loss amount was more than $200,000, intended to steal all the money from the accounts that he could: more than $400,000.

As such, a 14-level enhancement for loss is appropriate, which would result in a Sentencing Guidelines range of imprisonment of 78 to 97 months.

## C.    SECTION 3553(a) FACTORS

A sentencing court must start with the sentence advised by the Sentencing Guidelines. United States v. Booker, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). The Ninth Circuit has held that the Sentencing Guidelines sentence is a "starting point" to determine a reasonable sentence and that a sentence under the Sentencing Guidelines will usually be reasonable. See United States v. Carty, 520 F.3d 984, 994 (9th Cir. 2008) (en banc).

The government believes that the recommended sentence is reasonable in light of the factors the Court must consider under 18 U.S.C. § 3553(a). Specifically, such a sentence justly reflects the seriousness of defendant's crime of participating in an extensive and complex bank fraud scheme. The recommended sentence takes into

account the nature of all the offense conduct charged and defendant's criminal history.  Thus, the recommended sentence would serve to promote respect for the criminal laws, work to deter defendant and others from further criminal activity, and serve to protect the public from future crimes by this defendant.

Defendant has been a member of Armenian Power since at least 1999 – On November 11, 1999, defendant, who was then 21 years old, was arrested for assault with a deadly weapon, and his father was arrested for being a felon in possession of a firearm, and the arresting officers also executed a search warrant at the home of defendant and his father.  The case against defendant was later dismissed and defendant's father was later convicted.  The property recovered pursuant to that search warrant is relevant to the sentencing of defendant in several respects.

The search warrant produced evidence that defendant resided in the northwest bedroom of the residence.  His driver's license was found in a wallet in that room, along with several pieces of mail addressed to defendant.  Defendant's gang moniker is "Whisper." (See PSR at 2).  A sheet of paper with the moniker "Whisper" written on it was found in a backpack lying on the bed in defendant's bedroom.  (See Ex. 12 at 5-6 (Item 38).)

A search warrant executed on January 27, 2010 in this investigation at a gambling house in Burbank produced a roster of Armenian Power gang members, listed by their monikers.  Defendant was listed on that roster by the moniker "Whisper." (See Ex. 11 at 7.)

Defendant has been involved in identity theft since at least 1999 – The same search warrant on November 11, 1999 led to the

23

1  seizure of identity theft evidence from defendant's bedroom.

2  Defendant had $306 in cash in his bedroom, and seven ATM, check, and

3  other key cards in six different names: four names apparently male,

4  and two apparently female.  (See Ex. 12 at 5-8 (Items 59-65).)

5      Defendant fled to Armenia in 2003 to avoid prosecution for

6  attempted murder and assault with a deadly weapon – On June 13,

7  2003, an arrest warrant, with bail set at $1,215,000, was issued by

8  the Los Angeles County Superior Court for defendant for attempted

9  murder and assault with a firearm on a person, in case number

10  GA053647.  (See Ex. 10 at 2, 6.)

11      On August 12, 2003, Glendale Police Department ("GPD") officers

12  executed a search warrant at defendant's home.  Defendant was not

13  there.  That evening, a GPD detective spoke to defendant's attorney,

14  Anthony Brooklier, who told the detective that he had spoken to

15  defendant, and that defendant would turn himself in to the GPD.  By

16  August 21, 2003, defendant had not turned himself in.  (See Ex. 10

17  at 3-5.)

18      GPD reports from 2005 state that defendant had fled to Armenia.

19  He eventually returned to the United States and negotiated his

20  surrender to GPD on the warrant.  Defendant was convicted of assault

21  with a deadly weapon and sentenced to 36 months' probation and 180

22  days in jail.  (See Ex. 10 at 7.)  The police reports are

23  corroborated by defendant's marriage in Armenia in 2005.  (See PSR ¶

24  66.)  The government presented this evidence during a bail hearing

25  in this court in the related case, CR 10-531-GHK.  Defendant did not

26  deny that he had fled to Armenia, or present any evidence to the

27  contrary.

28

1       <u>Defendant carried on his marijuana conspiracy even after the</u>

2    <u>execution of a federal search warrant at his marijuana growing</u>

3    <u>operation in his home</u> – On February 10, 2010, a federal search

4    warrant was executed at defendant's home.  The agents found a

5    marijuana growing operation in the attached garage, a loaded .40

6    caliber handgun in the bedroom closet, and 2.38 kilograms of

7    harvested marijuana.  (<u>See</u> Ex. 3 (Photographs) & Ex. 13 at 1-3

8    (report).)

9       Defendant was not dissuaded from his marijuana conspiracy by

10    the discovery of the marijuana operation at his home.  He continued

11    to operate the Lankershim marijuana growing facility until it was

12    raided and seized by the LAPD on April 26, 2010.

13       <u>Defendant has been a leader of his criminal activity</u> –

14    Defendant's offenses are exacerbated by the fact that he is a leader

15    of his criminal activity.  The government submits that defendant led

16    and organized both his marijuana trafficking conspiracy, and his

17    identity theft offense, for the reasons stated above.  The Probation

18    Office found that defendant was a leader and organizer of the

19    identity theft offense, and that he managed and supervised the other

20    defendants in the marijuana trafficking conspiracy.  (<u>See</u> PSR ¶¶ 34,

21    41.)

22    **IV.   <u>CONCLUSION</u>**

23       Accordingly, the government recommends that defendant be

24    sentenced to 120 months' incarceration, followed by five years of

25    supervised release, and a mandatory special assessment of $200.

26

27

28