Michael V. Severo, Esq.  (SBN.: 072599)
**THE SEVERO LAW FIRM**
70 S. Lake Avenue, Ste. 945
Pasadena, CA 91101-4703
(626)844-6400
msevero@mvslaw.com

Attorneys for Defendant,
    MHER DARBINYAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>Vs.<br><br>MHER DARBINYAN, et.al.<br><br>           Defendant. | Case No.  11-CR-0072(A)-RGK<br><br>**DEFENDANT MHER DARBINYAN'S SENTENCING MEMORANDUM; RESPONSE TO PRESENTENCE REPORT AND OBJECTIONS THERETO**<br><br>Hearing Date:   11/10/2014<br>Hearing Time:   10 a.m.<br>Courtroom 850, Roybal Federal Bldg.<br>Hon. R. Gary Klausner |

Defendant MHER DARBINYAN hereby presents his position regarding sentencing, and offers his response and objections to the Probation Department's Pre-sentence Investigation Report ("PSR").

Dated:  October 31, 2014        THE SEVERO LAW FIRM

By    /s/  *Michael V. Severo*
        Michael V. Severo
        Attorney for Defendant
        MHER DARBINYAN

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................................................iii

1.  INTRODUCTION ...............................................................................1

2.  STATEMENT OF THE CASE .........................................................1

3.  DISCUSSION.......................................................................................3

   a.  Sentencing Guidelines Calculation .........................................6

     i.  Group 1 – The Extortion Counts ..........................................8

     ii.  Group 2 --The Fraud Counts .................................................11

     iii.  Group 3 – Felon-in-Possession Counts............................20

     iv.  Criminal History Category...................................................22

     v.  Multiple Count Adjustment .................................................22

   b.  Analysis of 18 U.S.C. § 3553(A) Factors.............................23

4.  CONCLUSION ..................................................................................26

5.  APPENDIX

     EXHIBIT A - TRIAL EXHIBIT 344

     EXHIBIT B - GOVERNMENT'S LOSS CHART

     EXHIBIT C - DECLARATION OF ANDRANIK BAKCHADJIAN

     EXHIBIT D - LETTER OF SUPPORT

**THE SEVERO LAW FIRM**
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

# TABLE OF AUTHORITIES

## CASES

### U.S. SUPREME COURT CASES

*Gall v. United States*, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)..............................................6

*Kimbrough v. United States*, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007)............................6, 7

*U.S. v. Booker*, 543 U.S. 220, 125 S. Ct. .................................................................. 4, 6

### U.S. COURT OF APPEALS CASES

*U.S. v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008) ....................................................8, 19

*U.S. v. Burns, 894 F.2d 334 (9th Cir.1990)* ...................................................................... 9

*U.S. v. Carty*, 520 F.3d 984, 991 (2008)..........................................................................4, 7

*U.S. v. Conner*, 537 F.3d 480 (5th Cir. 2008) ..................................................................19

*U.S. v. Lee*, 427 F.3d 881 (11th Cir. 2005)......................................................................19

*U.S. v. Onyesoh*, 674 F.3d 1157 (9th Cir. 2012)..............................................................17

*U.S. v. Pham*, 545 F.3d 712 (9th Cir. 2008) .................................................................. 20

*U.S. v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003) .............................................................. 8

*U.S. v. Staten*, 466 F.3d 708, 720 (9th Cir. 2006) ............................................................ 8

*U.S. v. Strozier,* 981 F.2d 281, 284 (7th Cir. 1992) ........................................................13

*U.S. v. Yagar*, 404 F.3d 967 (6th Cir. 2005)....................................................................19

*U.S. v. Tankersley* (9th Cir. 2008) 537 F.3d 1100 ..........................................................27

*United States v. Denardi*, 802 F.2nd 269, 277-77 (3rd Cir. 1989) ................................... 6

*United States v. Jordan*, 256 F.3d 922, 927-29 (9th Cir.2001)......................................... 8

*United States v. Ponce*, 51 F.3d 820, 827 (9th Cir. 1995) ...............................................21

*United States v. Treadwell*, 593 F.3d 990, 992-93 (9th Cir. 2010) .................................27

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

# STATUTES

18 U.S.C. § 922(g) ........................................................................................ 1, 3

18 U.S.C. § 1028(a) ................................................................................ 1, 2, 3

18 U.S.C. § 1029(b) .......................................................................................... 3

18 U.S.C. § 1029(e)(3) .................................................................................... 16

18 U.S.C. § 1344 ..................................................................................... 1, 2, 26

18 U.S.C. § 1951 ................................................................................................. 1

18 U.S.C. § 1951(a) ...................................................................................... 1, 2

18 U.S.C. § 1962(d) ..................................................................................... 1, 2

18 U.S.C. § 3553(A) ..................................................................................... 4, 25

18 U.S.C. § 3553(a)(1) ................................................................................ 4, 6

18 U.S.C. § 3553(a)(2) .................................................................................... 26

# UNITED STATES SENTENCING GUIDELINES

U.S.S.G. § 1B1.3 ............................................................................................... 11

U.S.S.G. § 2B1.1 ....................................................................... 12, 14, 16, 18

U.S.S.G. § 2B1.1(b)(11) ................................................................................ 20

U.S.S.G. § 2B3.2 ................................................................................................ 9

U.S.S.G. § §2K2.1 ............................................................................................ 22

U.S.S.G. § 3B1.1 ............................................................................................... 21

U.S.S.G. § 3B1.1(a) ........................................................................................ 21

U.S.S.G. § 3D1.4 .............................................................................................. 24

U.S.S.G., Ch. 3, Part D ..................................................................................... 7

# TREATISES

Black's Law Dictionary, (9th ed. 2009) ................................................... 23

**THE SEVERO LAW FIRM**
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

# 1. INTRODUCTION

On January 26, 2011, defendant Mher Darbinyan and 67 other defendants were first charged in a 140-count indictment and 11 criminal forfeiture allegations.   He was alleged to have violated 18 U.S.C. 1962(d), (the Racketeering Influence and Corrupt Organizations Act), extortion, 18 U.S.C. § 1951(a), bank fraud, 18 U.S.C. § 1344, aggravated identity theft, 18 U.S.C. § 1028A, and  two separate counts of felon in possession of a weapon, 18 U.S.C. 922(g).

Many of the defendants were severed into different groups.

Trial commenced on March 25, 2014.  The government proceeded on 57 counts. On April 17, 2014, the jury rendered a guilty verdict as to all 57 counts.  The probation department disclosed its Presentence Report ("PSR") on June 16, 2014. On July 22, 2014, the government filed its sentencing position.

On June 9, 2014, Mr. Darbinyan filed his motion for new trial.

On June 24, 2014, on the court's own motion, the sentencing hearing was continued to September 8, 2014.   On August 20, 2014, again on the court's motion, sentencing was continued to September 9, 2014.   Thereafter, upon stipulation of the parties, sentencing was continued to September 18, 2014.

In August 2014, defendant caused to be served a subpoena for documents on 99-Cents Only Stores.   On motion of the defendant, the sentencing hearing was again continued to November 10, 2014, to allow defendant time to obtain 99-Cents' records as requested.

## 2. STATEMENT OF THE CASE

### Charges and Counts of Conviction

Mr. Darbinyan was charged in a First Superseding Indictment ("FSI") as follows:

- Count One, violation of 18 U.S.C. § 1962(d), Racketeer Influenced and Corrupt Organizations Conspiracy;

- Counts Four and Five, conspiracy and interference with commerce by threats and violence, violation of 18 U.S.C. § 1951(a);
- Counts Six through Twenty-Two (17 counts), Bank Fraud, violation of 18 U.S.C. § 1344 alleging a check fraud scheme.  No conspiracy was alleged as to the bank fraud counts in the check fraud scheme.  In these fraud allegations, the FSI alleged that the victims were financial institutions.  At trial, the government proceeded only on counts Six through Nineteen, for a total of 14 counts.  The total of the sums shown at trial to have been taken in the alleged check fraud scheme amounted to $384, 975.00.  The government called 5 witnesses whose accounts had been used to obtain the aforesaid sum.  Each individual testified that in the case of those whose funds were actually withdrawn from the account, the money was returned by the bank.  In some instances, the checks that were alleged to have been drawn fraudulently were never withdrawn.
- Counts Twenty-Three through Thirty Seven, violation of 18 U.S.C. § 1028(a), identity theft.  These allegations were tied to Counts Six through Twenty-Two.  At trial, the government proceeded on Counts Twenty Three through Thirty Four, for a total of 12 counts.  In total, the identity of
- Counts Thirty Eight through Sixty Eight (31 counts), violation of 18 U.S.C. § 1344 alleging an access device (or credit card) scheme.  The access device scheme involved exclusively the use of pin pad machines at 99-Cents Only Stores ("99-Cents") in various parts of Southern California.  At trial, the government proceeded on 14 counts, and put on evidence that the total loss was $4,800.  The counts that the government proved were counts 38, 39, 40, 41 44, 45, 48, 50, 51, 54, 57, 60, 63, and 64.  As with the check fraud scheme, the FSI alleged that several financial institutions were the victims of the crime.  At trial, the government called 7 individuals whose accounts had been used to obtain the $4,800.  Further, each of the 7

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

individuals testified that they had sustained no loss because the various banks returned the money to their respective accounts.

- Counts Sixty Nine alleged a violation of 18 U.S.C. 1029(b)(2), access device conspiracy. This conspiracy alleged that defendant was involved in trafficking in one or more counterfeit access devices, possessed fifteen or more counterfeit or unauthorized access devices, and possessed device-making equipment. While the FSI alleged that Mr. Darbinyan had stated that he had 400 account numbers, no evidence was introduced demonstrating that any such number of accounts were ever possessed or used by Mr. Darbinyan or any of the other named co-conspirators.

- Counts Seventy One through Ninety Three (23 counts) alleged a violation of 18 U.S.C. § 1028(a), identity theft. These allegations were tied to Counts Thirty Eight through Sixty Eight. At trial, the government proceeded on 11 of the 23 counts and relied on the same 7 witnesses as in counts Thirty Eight through Sixty Eight.

- Counts 128 and 129 alleged a violation of 18 U.S.C. § 922(g), felon in possession of firearms and ammunition.

## 3. DISCUSSION

As result of the dual majority opinion in *U.S. v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), the final sentencing analysis is done under 18 U.S.C. § 3553(a)(1). As a component of that analysis, the range provided in the Guidelines is considered by the court, but only on an advisory basis. *U.S. v. Booker*, supra, opinion by Breyer, J. at page 756. Thus, while the Guidelines calculation is a required consideration under § 3553(a)(4), the statute requires that the district court fashion a sentence in light of all other statutory concerns as well. *U.S. v. Menyweather*, 447 F.3d 625 (9th Cir. 2006).

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

In determining the sentence in an advisory guideline regime, this court is obligated to follow the mandate of § 3553(a), i.e., to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the sentencing objectives of subsection (2). *U.S. v. Carty*, 520 F.3d 984, 991 (2008).

In its entirety, § 3553 provides as follows:

(a) Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary , to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider-

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for-
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines-
(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28,
United States Code, subject to any amendments made to such Guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
(B) in the case of a violation of probation or supervised release, the applicable Guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of the title 28, United States Code, taking into account any amendments made to such Guidelines or policy statements by act of Congress (regardless of whether such

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ◆ PASADENA, CA 91101

amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

5)    any pertinent policy statement-

(A)    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by the act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B)    that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

In assessing these factors, neither the statute nor *Booker*, suggests that any one factor is more important, or to be given greater weight, than any other.

As seen in the wording of § 3553, the overriding principle in sentencing is that the court is required to impose a sentence  "sufficient, but not greater than necessary," to comply with the express purposes of sentencing found at subsection (a)(2), to wit, retribution, deterrence, incapacitation, and rehabilitation.

One court has been led to express that this overriding principle is not just a factor to be considered, but rather, it sets a limit on the sentence that the court may impose. *United States v. Denardi*, 802 F.2nd 269, 277-77 (3rd Cir. 1989)(Becker, J. concurring in part, dissenting in part).

In *Kimbrough v. United States*, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), the Supreme Court specifically highlighted the importance of the "sufficient, but not greater than necessary" mandate of § 3553(a).  It held that "under *Booker*, the cocaine Guidelines, like all other Guidelines, are advisory only.... A district judge must include the Guidelines range in the array of factors warranting consideration.  The judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater

THE SEVERO LAW FIRM

70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

than necessary' to serve the objectives of sentencing," to wit, retribution, deterrence, incapacitation, and rehabilitation.

On the same day that *Kimbrough* was decided, the Court also issued its opinion in *Gall v. United States*, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The Court in *Gall* also reiterated the principle that the Guidelines are not mandatory, "and thus the range of choice dictated by the facts of the case is significantly broadened. Moreover, the Guidelines are only one of the factors to consider when imposing sentence...." *Id.* at page 602.

And, it is notable that the district court "may not presume that the Guideline range is reasonable" and it is not to be given more or less weight than any other factor. *U.S. v. Carty*, supra at 991.

The important principle to be gleaned from the wording of the statute is that all of the factors set forth in Section 3553 are to be analyzed with a view towards imposing a sentence that is "not greater than necessary" to comply with the four purposes of sentencing.

The Ninth Circuit in *Carty*, supra, has ordered that all sentencing proceedings are to begin with a determination of the applicable Guidelines range. It also charged the district court with the duty of making a *correct* calculation because the Guidelines is the "starting point and the initial benchmark," citing *Kimbrough*, supra at p. 574. *Id.* at 991.

a.    **Sentencing Guidelines Calculation**

In determining the appropriate Guidelines range, the PSR concluded that Mr. Darbinyan's conviction required application of the procedure for determining the offense level on multiple counts. U.S.S.G., Ch. 3, Part D.  See PSR, p. 15, ¶ 21.  It thus divided the offenses into three separate groups, to wit, Group 1 (Extortion Conspiracy and Extortion, Counts 4 and 5); Group 2 (Bank Fraud; Counts 6-19, 23-34, 38-66, 69,

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

71-93)[1];  and Group 3 (Felon in Possession of Firearms and Ammunition; Counts 128 and 129).

Defendant contends that the PSR's and the government's Guidelines calculations are skewed higher by the inappropriate application of many of the factors in the different groups, but particularly, in the Group 2 fraud analysis.

Even after Booker, supra, due process plays a critical role with regard to the factual determinations inherent in criminal sentencing. *U.S. v. Staten*, 466 F.3d 708, 720 (9th Cir. 2006).   Due process concerns are generally satisfied when the district court uses a preponderance of the evidence standard of proof in finding facts at sentencing." *Id.*; *U.S. v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008) (Citations omitted.)   When, however, the combined impact of contested sentencing enhancements is disproportionate relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence. *U.S. v. Staten,* supra, 466 F.3d at 719;   *U.S. v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003); *United States v. Jordan*, 256 F.3d 922, 927-29 (9th Cir.2001);

Defendant contends that here the court must apply the clear and convincing standard because in Group 2 the loss and victim calculations by both the PSR and the government far exceed the *extent* of the conspiracy that the jury found.

 Moreover, "in resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, *provided that the information has sufficient indicia of reliability to support its probable accuracy*." U.S.S.G. § 6A1.3(a) ("Resolution of Disputed Factors") (Emphasis supplied); See, generally, *U.S. v. Burns*, 894 F.2d 334 (9th Cir.1990).

Because the facts set forth by the government in support of its position, are far less than reliable and cannot conform to notions of due process in sentencing, it cannot meet the clear and convincing standard that is applicable herein.

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

---

[1]  This Group, labeled "Bank Fraud" includes all counts of conviction related to the check fraud scheme and the 99-Cents Only Store scheme.

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

###### i.    **Group 1 – The Extortion Counts**

1.    *The Presentence Report*

The Probation Office computed this group following the rules in U.S.S.G. § 2B3.2.   In doing so, the PSR computed the offense level for this group as follows:

| | | |
|---|---|---|
| **a.** | Base Offense Level – §2B3.2 | 18 |
| **b.** | Threat of Death or Serious Bodily Injury –(b)(1) | +2 |
| **c.** | Demand of More Than $50,000—(b)(2) | +2 |
| **d.** | Possession of Firearm – (b)(3)(A)(iii) | +5 |
| **e.** | Victim Physically Restrained – (b)(5)(B) | +2 |

**Total PSR Group Adjusted Offense Level**    **29**

2.    *Defendant's Objection to PSR Calculation and Response*

In addition to the legal challenges to these counts that were presented by Defendant in pretrial and post-trial motions, he contends that the evidence in this case demonstrates (a) a limited role in his contacts with Minas Matosyan, (b) no evidence that he was involved in threats of "serious bodily injury," (c) defendant loaned money to Mr. Matosyan in order to prevent harm to him and (d) the enhancements for possession of a firearm and restraint of the victim are not properly applied to him because (1) there was no evidence that he was aware of the involvement by others and (2) the actions by Emil Arapetian (use of a firearm and physical restraint) were not reasonably foreseeable to Mr. Darbinyan.

First, it is important to point out that the entire plot was conceived, instigated, and put into action by defendant Sharopetrosian to collect a personal debt owed to his family by Minas Matosyan.   The government presented evidence that defendant Sharopetrosian's involvement with the debt collection effort spanned a period of approximately five months, from June 2009 through November 2009.   Mr. Darbinyan was asked by defendant Sharopetrosian to speak to Mr. Matosyan starting on June 29, 2009.   The evidence showed that the last conversation involving Mr. Darbinyan took place on July 6, 2009, a total on one week.   Furthermore, between June

29 and July 6, 2009, no evidence that Mr. Matosyan paid any money was introduced as a result of any statements made by Mr. Darbinyan was adduced.  Finally, as Mr. Matosyan himself acknowledged when he testified, Mr. Darbinyan gave him $1,000 to pay to Sharopetrosian to put off any actions by the latter.

The government's position is misleading and fails to properly contextualize the phone calls it quotes.  It also ignores defendant's actions in lending money to Mr. Matosyan in order to put off any potential risk of harm as voiced by defendant Sharopetrosian.  Thus, at page 9 of its sentencing position, the government directs the court to some of the intercepted telephone calls and statements made by Mr. Darbinyan.  Clearly, some of the statements made represent more of the now familiar Darbinyan bluster.  It is obvious that Mr. Matosyan would not be "grabbed by the neck" in a phone call! (See Gov't. Exhibit 71; Call intercepted on 6/29/09).  Furthermore, for the hundreds of intercepted calls recorded by the government, none was presented that showed that Mr. Matosyan ever called defendant back on 6/29, for the next call in evidence took place 4 days later.   None of the other statements by Darbinyan suggest any specific type of bodily injury, much less "serious" bodily injury.

Supporting defendant's contentions in this regard are call numbers 853 and 858 intercepted on defendant's phone number (310) 779-1177 (Target Telephone #8).  In that call, not offered by the government at trial, Matosyan has a friendly conversation with defendant and asks defendant, "What can *we* do?" in connection with defendant's assistance in borrowing money to help him stave off defendant Sharopetrosian's threats.   Defendant responded: "Is there anybody else you can see?" and Matosyan responds: "I don't have anyone.  The one friend I have, he's not here.  You tell me what can we do?"  Defendant responds: "Make a few more phone calls.  I'm going to make some phone calls to see also."

After defendant is able to obtain $2,000 to help Matosyan, he says: "There's a $1,000 that I just picked up.  There's $2,000 with me.  When Arman [Sharopetrosian] calls now I'll tell him that you brought it.  Again, I'm saving your ass—

THE SEVERO LAW FIRM<br>70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

so the brother doesn't worry about it."  Further supporting defendant's efforts to aid Mr. Matsoyan are intercepted calls 1297, 1304, 1375

Based on the evidence presented at trial, defendant's involvement stopped on July 9, 2009.   That is to say, Mr. Darbinyan was no longer a member of the conspiracy after that date.   Mr. Matosyan went to the FBI on September 3, 2009, nearly two months later.  When he made his report to the FBI, he never mentioned Darbinyan or any actions by this defendant that could enhance his role in this offense.

Accordingly, defendant posits that the correct Guidelines calculation should be:

| | | |
|---|---|---|
| **a.** | Base Offense Level – §2B3.2 | 18 |
| **b.** | Demand of More Than $50,000—(b)(2) | +2 |

**Total PSR Group Adjusted Offense Level**     **20**

In arriving at this calculation, defendant invites the court's attention to U.S.S.G. § 1B1.3.  This section generally governs the factors that determine the guideline range.  Those factors include all acts aided, abetted, counseled, etc. by the defendant.  Of specific application herein, the section requires that in determining the enhancements and adjustments to be made in calculating he Guideline range, the court include, "in the case of a jointly undertaken criminal activity…, *all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."* Subsection (a)(1)(B).

Nothing in the evidence at all suggests any involvement by this defendant in the alleged physical restraint and firearm use by others.   None of the conversations intercepted nor the testimony presented at trial demonstrated that defendant was involved in any act that would require imposition of those enhancements.  Nor is there any evidence that Mr. Darbinyan could reasonably foresee the use of a firearm to physically restrain the defendant.   The acts complained of were the acts of Emil Arapetian, with whom defendant had no communication concerning Mr. Matosyan and about whose actions defendant was not notified.

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

ii.      **Group 2 --The Fraud Counts**

*1.*      *The Presentence Report*

The Guidelines range for this group is the highest of the three groups.  The government's case at trial was mostly centered on the bank fraud charges and was the group that contains the highest number of convicted counts.

In this group, the PSR applied the provisions of U.S.S.G. § 2B1.1.   The results of this computation are:

       **a.**   Base Offense Level - § 2B1.1 (PSR ¶ 32)        7

       **b.**   Loss more than $1,000,000 but
          less than $2,500,000.  §2B1.1(b)(1) (PSR ¶ 33 )   +16

       **c.**   Sophisticated Means.  §2B1.1(b)(10) (PSR ¶ 36)   + 2

       **d.**   Possession or Use of
          Device-Making Equipment. §2B1.1(b)(1). (PSR ¶ 37)   + 2

       **e.**   More than 250 Victims. §2B1.1(b)(2)(C). (PSR ¶ 38)   + 6

       **f.**   Role in the Offense. §3B1.1(a). (PSR ¶ 40)   + 4

       **Total PSR Group Adjusted Offense Level**   **37**

2.      *Defendant's Objection to PSR Calculation and Response*.

Both the U.S. Probation Office and the government have wrongly calculated this group's guidelines for a variety of reasons.

a.   Loss Calculation.  §2B1.1(b)(1).

The PSR's loss calculation relies entirely on the allegations in the indictment and unproven assertions by the government.

1)      The Check Fraud Scheme:   The PSR, at ¶¶ 10 through 12, blindly regurgitates the allegations in the complaint that this scheme occurred between July 2008 and December 2010.  The evidence at trial, however, showed that fraudulent checks were drawn on five bank accounts between January 2009 and April 2009.  See Government Exhibits 251 through 255.   Moreover, the total amount of the fraudulent checks shown at trial was $278,432, a far cry from the unsupported PSR's conclusion

that $640,616.09 was "identified as pertaining to Darbinyan's activities...." The government's contention that defendant "sought to deplete the entire contents" of the five bank accounts is totally without support and is belied by the facts. The fraudulent checks that were written against those accounts occurred in 2009. However, defendant was not arrested until 2010. Thus, had there been an intent to ransack the entire balance in the accounts, it could have happened prior to defendant's arrest. In this regard, the government's reliance on *U.S. v. Strozier,* 981 F.2d 281, 284 (7th Cir. 1992), where the court observed that defendant Strozier would have withdrawn the balance of the account *had he not been arrested,* is inapposite. In this regard, defendant agrees with the PSR, at ¶ 35, where the probation officer states that "there was no specific information that Darbinyan planned to drain the accounts entirely and refused to add the $640,616.09 to intended loss. Clearly, no such intent existed and the intended loss of $640,616.09 cannot be attributed to Mr. Darbinyan.

          2)     The 99-Cents Only Stores Scheme:  In this part of the case, the government proceeded on an access device conspiracy (Count Sixty Nine) that included 11 counts of identity theft related to six (6) different individuals, for a total loss of $4,800.   In an effort to show a large amount of *intended* loss, the government also offered in evidence a list of what they termed to be 1,983[2] names with associated numbers that its witnesses identified as "unique account numbers." (See Trial Exhibit 344, attached hereto as Exhibit B).   Also, the same 1,983 names were used in the PSR to add 6 levels as an enhancement for 250 or more victims, as required by U.S.S.G. § 2B1.1(b)(2).

          i.     Actual Loss.

          At trial, the government presented evidence that five access device numbers were fraudulently used to obtain $4,800.

          In attempting to establish additional actual loss, the government presented in Exhibit 1 to its sentencing position a chart of losses entitled

          [2] As noted below, the correct count of unique numbers shown on Exhibit A is 1,420, not 1,983.

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

"99 Cent Store Actual Losses." A copy of the exhibit, originally filed as Document #3398-1 is also attached hereto as Exhibit A for ease of reference. As shown on the exhibit, the total amount advanced as of the purported actual loss resulting from the scheme is $167,169.57. Initially, it is worth noting that the exhibit specifically states that "adjusted" losses by Arrowhead Credit Union in the sum of $8,199 and Schools First Credit Union in the sum of $6,355.00 could not be "positively connected to crew." It appears from this cryptic note that the losses sustained by these two institutions could not be attributed to any activities associated with this case. Therefore, the adjusted amount of loss should be $152,615.57. Also significant is the notation regarding the $18,300 Ventura Credit Union figure. This sum was provided "verbally" by the bank investigator to the Huntington Beach Police Department. The reliability of this information is thus questionable since it is not known whether the loss flowed from the fraudulent use of access devices that can be traced to this defendant, the number of victims, dates of transactions, amount of each transaction, access device numbers or any other information that would tie the loss to the activities alleged in this case.

More importantly, the government has failed to tie those losses to Mr. Darbinyan. The evidence at trial established that defendant Andranik Bakchadjian was involved in the 99-Cents Only stores at Limonite (Riverside), Huntington Beach, Ventura, Camarillo. Despite the massive number of intercepted calls, including several phone numbers for Mr. Darbinyan, the government did not present any evidence of any conversations between Darbinyan and Bakchadjian. In support of this contention, defendant invites the court to call on August 24, 2009, where, after approximately 9 minutes of conversation with Artur Markaryan ("AM"), AM states: "Are you aware of…Andranik?" Defendant: "No." AM: "They arrested him, brother." Defendant: "For what?" AM: He went to do something, and they arrested him." Defendant: "No, I am not aware."

Finally, counsel for Mr. Darbinyan received an unsolicited document entitled "Affidavit of Andranik Bakchadjian. In it Mr. Bakchadjian states in resolute terms:

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

13

Regarding my placement of equipment and machinery inside of .99¢ Stores for the purposes of collecting credit card information, I solemnly aver that Mr. Darbinyan never counseled, coerced, induced, threatened or otherwise procured my involvement in this scheme.  Mr. Darbinyan never directed my participation I this scheme against any .99¢ Store or any other entity.  He never encouraged, rewarded, or benefitted in any way from my actions.  In the plainest possible terms, my offenses against the United States in no way involved Mr. Darbinyan.

A true and correct copy of his declaration is attached hereto as Exhibit C.

More to the point, there is absolutely no evidence that any funds taken from the fraudulent use of access devices were traceable to Mr. Darbinyan or anyone connected with him.   The notion that all of these losses are attributable to Mr. Darbinyan arises out of the simple fact that all of the defendants in this case are Armenians – nothing more.  As defendant has pointed out in earlier proceedings, there was no single unified effort in this caper, but rather a number of separate cells working independently.

No matter what approach the court takes, the actual loss figure in this part of the case cannot exceed $134,315.57.

ii. Intended Loss

Realizing that its recommended sentence cannot be justified on the strength of the actual loss in the case, the government posits that Exhibit B, (Trial Exhibit 344) contains 1,983 unique account numbers and contends that Application Note 3(F)(i) of USSG § 2B1.1 requires that the court value each such number at $500. The PSR follows the government's position in that respect.  They are both wrong for several reasons.

First, as applicable to the facts of this case, Application Note 3(F)(i) states that: "In a case involving any counterfeit access device or unauthorized access device, loss includes any *unauthorized charges made with the counterfeit access device or unauthorized access device* and shall be not less than $500 per access device...." (Italics added.)  The PSR's and the government's approach misconstrue the meaning of this Application Note.  The plain meaning of the note requires that the

14

"$500-per-device" be applied only when actual charges are made, not when they are imaginary or even remotely possible. Therefore, it is manifest that the application of the $500-per-access-device formulation in a case where no charges are attributable to any of the numbers listed on Exhibit A is an improper application of Appl. Note 3(F)(i).

Pursuant to 18 U.S.C. § 1029(e)(3), account numbers that "can be *that can be used*, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds" are considered access devices. (Italics added.) No evidence was presented that the names and numbers on the government's exhibit were actual access device numbers, were ever used, sustained any type of actual loss, nor that these numbers were *active* credit/debit card numbers, nor that the numbers were usable, i.e., could be used to obtain goods and services. However, as more particularly shown below, based on these 1,983 numbers, the PSR, prodded by the government, calculated a loss amount in excess of $1,000,000, resulting in a 16-level increase in the offense level. Both the PSR and the government ignore the law in this circuit. Essentially, then, the Government's argument that the U.S. Probation Office ("USPO") has "determined" the loss based on 1,983 access devices only reflects the USPO's reliance on what the Government has told the USPO, without a proper analysis or investigation of the origin, nature and usability of the 1,983 numbers. This position disregards the law of this Circuit. In *U.S. v. Onyesoh*, 674 F.3d 1157 (9th Cir. 2012), a case that arose in this district, the court specifically held that in order to enhance a sentence on the basis of the use of unauthorized access devices, the Government must prove the usability of the credit card numbers. That is to say, the government has the burden of showing, at a minimum, that the list (a) contains credit card numbers, (b) that have not expired, (c) and that the numbers of the list were actually customers of 99-Cents. The government has failed to prove that the numbers that were downloaded, not from 99-Cents' computers, but from a skimmer, were useable. Whether those numbers were in that skimmer before it was attached to any used POS terminal at a 99-Cents Only store in

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

July/August 2009 is still a mystery.  Significantly, not one of the names listed on Exhibit A has been shown to have been used nor has it been shown to have been customers who visited 99-Cents Only stores in the relevant time period.

In this regard, it is notable that a review of Trial Exhibit 344 (Exhibit A) raises questions about the reliability of its content.  For example, an accurate count of the "unique account numbers" shows that there are not 1,983 numbers but 1,420; the numbers for each name are shown to be run repeatedly and within seconds of each other.   See, for example, page 7 of 76, Natasha Parsons, run 4 times in a row, each within 26 to 60 seconds of each other; p. 10 of 76, Michelle Lomeli, run 2 times, within 7 seconds of each other; p. 33 of 76, Michelle Lomeli – again- same number; p. 10 of 76, Ronald Ferrell, run 2 times, within 14 seconds of each other.   Also at page 33 of 76, three names Michelle Lomeli, Martha Gutierrez and Debra Ramirez, all are followed by the same number – "4912."   Moreover, in other instances, it appears that the system is accepting numbers for a continuous 24-hour period.  Curiously, the download does not show that Personal Identification Numbers ("PIN") necessary to be able to withdraw cash from ATM machines.  Of course, as noted in earlier filings, the government never presented any evidence that any of the 1,983 numbers reported found their way to an actual fraudulent debit card or is part of any list involving actual loss.  Therefore, defendant questions whether any of the names on those access devices are (a) actual, unexpired, useable credit card numbers, and (b) the list (Trial Exhibit 344) actually names 99-Cents customers, for the list was generated by purportedly by downloading the skimming device and never matched to any real list of customers.

The government has not carried its burden (even under a preponderance of the evidence standard) to show an intended loss.

In summary, the government's evidence at best shows a loss in the check fraud scheme of $278,432 and a loss of $134,315.57 in the 99-Cents Only scheme, for a total loss of $412,747.57.

16

### b. Who Are Victims?

The government contends, and the PSR agrees, that defendant should be chargeable with having defrauded 250 or more victims.   The PSR, without analysis or support, states that, "Well over 250 individuals had their identification used unlawfully or without authority."   See PSR, p. 17, ¶ 38.  Yet, and as will be seen below quite significantly, the probation officer, at the bottom of page 14 states:  "Specific information regarding victims and compensable loss amounts was not received."

Application Note 1 to USSG § 2B1.1 defines "Victim" in no uncertain terms as follows:  "'Victim' means (A) any person who sustained any part of the *actual loss* determined under subsection (b)(1)...."  (Italics added.)    Additionally, Application Note 3(A)(i) states that "'Actual loss'" means the reasonably foreseeable pecuniary harm that resulted from the offense."  And, Appl. Note 3(A)(iii) defines "pecuniary harm" as "harm that is monetary or that is otherwise readily measurable in money.  Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm."

First, any attempt in the PSR or by the government to count the 1,983 access device numbers as victims can be easily repudiated by the very definition set forth above.  It has not been shown that any of those individuals suffered any actual loss.

It is also pertinent to point out that the FSI specifically alleged that the named defendants executed "a scheme to defraud Bank of America, Citibank, JP Morgan Chase Bank and other financial institutions...."  Clearly, the government intended to show that the banks, not specific individuals, were the victims of the various schemes.   In this regard, *U.S. v. Armstead, supra,* is instructive.  In *Armstead*, the Ninth Circuit refused to follow the rule announced by the Eleventh Circuit in *U.S. v. Lee*, 427 F.3d 881 (11th Cir. 2005), "which would allow the district court to include as victims persons who were fully reimbursed if their losses were neither

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

short-lived nor immediately covered by third parties without regard to whether their losses were included in the loss calculation." *Id.* at p. 895.  Rather, the *Armstead* court followed the Fifth and Sixth Circuits in evaluating the number of victims in a credit card fraud scheme.  It held that credit card account holders could not be counted as victims "because they were quickly reimbursed and there was no evidence that any account holder had to spend money or an extended length of time seeking reimbursement…. The only victims were the five credit card companies that reimbursed the account holders." *U.S. v. Armstead,* 552 F.3d at 782, citing *U.S. v. Yagar*, 404 F.3d 967 (6th Cir. 2005) and *U.S. v. Conner*, 537 F.3d 480 (5th Cir. 2008).   Furthermore, the *Armstead* court stated that its ruling was consistent with the Ninth Circuit's earlier ruling in *U.S. v. Pham*, 545 F.3d 712 (9th Cir. 2008) that an individual account holders can only be counted as "victims" if they sustained any part of the actual loss.  As stated by the court, *Pham* held that an individual could be a victim if her losses were not immediately reimbursed.  *Id.* at page 782.

Here, the government did not elicit any testimony from the individual account holders who testified at trial whether they had suffered any unreimbursed losses or whether they sustained any "pecuniary harm."  In fact, the defense at trial specifically asked each of the five victims whether they had been fully reimbursed by the financial institutions and received an affirmative answer in every instance.

Given that the only evidence is that 7 financial institutions as shown on Exhibit B[3] reimbursed their account holders, the Victim Adjustment may not be imposed on Mr. Darbinyan.

### c.   Device-Making Equipment

USSG § 2B1.1(b)(11) provides for a 2-level increase if the offense involved possession of access device making equipment.   The PSR adds the enhancement to this defendant despite the total dearth of evidence regarding (1) his

---

[3] The exhibit lists 9 financial institutions but, as discussed above, neither Arrowhead Credit Union nor Schools First Credit Union could tie their losses to the activities in this case.

actual possession of any device-making equipment, or (2) possession by anyone in the conspiracy of such equipment.  Nothing in the PSR's recitation of facts, starting at page 13, ¶ 13, points to the use or possession of such a device.  In fact, in the more than 5 years since the offense occurred, the government has not seized any device-making equipment from any co-conspirator in this case.  The use of this enhancement in the face of no evidence of the use or possession of such is inappropriate.

### d.  Leadership Role

USSG §3B1.1(a) provides that where defendant is a leader or organizer of criminal activity that involved five or more participants, a 4-level enhancement should be applied.

Appl. Note 4 of U.S.S.G. § 3B1.1, in turn, sets forth seven explanatory factors that illuminate whether a defendant is an "organizer" or a "leader" and we consider these factors in determining whether to apply the adjustment for aggravating role in the offense:   (1) exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. *United States v. Ponce*, 51 F.3d 820, 827 (9th Cir. 1995)

While the government's best evidence at trial may point to Mr. Darbinyan's participation based on the interpretation of statements made by him, the government did not introduce any evidence that he organized any of the schemes or was otherwise substantially more culpable than other participants.   Thus, no evidence of the exercise of decision making authority was introduced beyond receiving calls from defendant Tarverdyan where Tarverdyan's own exploits are set forth but with no indication that Darbinyan was directing him or anyone else.  Additionally, defendant Gustavo Ortega testified about going to the San Diego store.  However, there was no evidence that Darbinyan was in San Diego or that any individual or financial institution

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

suffered any loss out of anything that happened in San Diego.   There certainly is no evidence that defendant received or claimed any share of any of the proceeds, much less a larger share than other participants; or that he somehow bankrolled the enterprise. There simply is no evidence that he exercised any greater degree of control over any other known participant.

Accordingly, defendant contends that the correct calculation for this offense group should be:

| | | |
|---|---|---|
| **a.** | Base Offense Level - § 2B1.1 | 7 |
| **b.** | Loss more than $400,000 but less than $1,000,000.  §2B1.1(b)(1)(H) | +14 |
| **c.** | Sophisticated Means.  §2B1.1(b)(10) (PSR ¶ 36) | + 2 |
| | **Total PSR Group Adjusted Offense Level** | **23** |

Even if the court disagrees with this calculation with respect to the device-making equipment and role in the offense, the highest possible offense level for this group would be **29.**

### iii.      Group 3 – Felon-in-Possession Counts

1.      *The Presentence Report*

The Probation Office computed this group following the rules in U.S.S.G. § §2K2.1.  In doing so, the PSR computed the offense level for this group as follows:

| | | |
|---|---|---|
| **a.** | Base Offense Level – §2K2.1; (PSR ¶ 43) | 22 |
| **b.** | Three or More Firearms --§2K2.1(b)(1)(A); (PSR ¶ 44); | +2 |
| **c.** | Firearm with Obliterated Serial Number -- §2K2.1(b)(4)(B); (PSR ¶ 45) | +4 |
| **d.** | Organizer, Leader, Manager, or Supervisor- §3B1.1(c). (PSR ¶ 47). | +2 |
| | **Total PSR Group Adjusted Offense Level** | **30** |

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

2.      *Defendant's Objection to PSR Calculation and Response*.

In addition to the legal challenges to these counts that were presented by defendant in pretrial and post-trial motions, he contends that the calculation of the guidelines by PSR, as suggested by the government, is incorrect.

Defendant concurs that given the testimony at trial and the court's rulings on the defendant's Rule 29 and 33 motions, the base offense level should be 22, and that the 2-level enhancement for three or more firearms are appropriate.

Defendant is at a loss on the application of a 4-level enhancement for an "obliterated" serial number. The PSR's justification for the application of this enhancement bears repetition here:

> The Intratec model Tec-22 .22 caliber semi-automatic pistol, *bearing serial number 36039*, had an obliterated serial number (officers were able to remove the concealment of the serial number after the offense to identify the firearm, but it was obliterated at the time of the offense. (Italics ours.)

"Obliterate" is defined in Black's Law Dictionary, (9th ed. 2009), thus: "1. To wipe out, rub off, or erase (a writing or other markings). 2. *To remove from existence; to destroy all traces of.*" (Italics added.)

Aside from the internal incongruity of the statement in the PSR, the probation officer (probably aided by the government) fails to distinguish between "concealment" and "obliteration." The USSG section enhances obliteration *not* concealment.

Clearly, this enhancement does not apply.

Neither is there any reason to add additional levels for manager, supervisor. The justification for this enhancement is that defendant asked a co-defendant to store the firearms and another co-defendant to pick them up. The evidence at trial failed to disclose any such arrangement or the fact that defendant "directed" anyone to do anything. Again, this enhancement should not be applied.

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

Moreover, to the extent that the court imposed an enhancement for role in the offense in Group 1, applying additional levels in this offense may be duplicative.

Accordingly, defendant contends that the correct calculation for this offense group should be:

| | | |
|---|---|---|
| **a.** | Base Offense Level - §2K2.1 | 22 |
| **b.** | Three or More Firearms --§2K2.1(b)(1)(A); | +2 |
| | **Total PSR Group Adjusted Offense Level** | **24** |

Should the court disagree on the role in the offense enhancement, the highest possible offense level for this offense is **26**.

### iv.    Criminal History Category

The PSR's Criminal History Category IV is correct.

### v.    Multiple Count Adjustment

Where, as here, defendant is convicted of multiple counts that group separately, adjustments for the different group levels must be made pursuant to USSG § 3D1.4.   Here, depending upon this court's findings, the multiple count adjustment may yield different results.

(1) Defendant's Guidelines Calculation:

1. Group 1:  20
2. Group 2:  23
3. Group 3:  24

Because Group 3 yields the highest offense level, it is given one point (§ 3D1.4(a)), and 1 unit for each of the other two groups because they are 1 to 4 levels less serious, for a total of adjustment of 3 units.

This calculation yields a total offense level of **27.**

With a Criminal History IV, this calculation yields a range of 100 to 125 months.

(2) Alternative Calculation:

    1.  Group 1:  20

    2.  Group 2:  29

    3.  Group 3:  24

Because Group 2 yields the highest offense level, it is given one point (§ 3D1.4(a)).  Group 3, 5 levels lower, receives ½ point, while Group 1 is disregarded because it is 9 levels lower.

This calculation yields a total offense level of **30**.

With a Criminal History IV, this calculation yields a range of 135 to 168 months.

**b.**    **Analysis of 18 U.S.C. § 3553(A) Factors**

    1.      <u>History and Characteristics of the Defendant.</u>

Defendant's history and characteristics also support defendant's recommended sentence.      As the probation officer notes, the defendant has been married to his wife for approximately 15 years and is the father of two boys, ages 10 and 5.   He is a loving and devoted father.

He suffered prior convictions the Los Angeles County Superior Court for second degree robbery and grand theft.   He received state prison commitments of 3 and 4 years, respectively.

Whatever characterization of the Mr. Darbinyan the government wishes to impress upon the curt, or whatever words his lawyer wishes to employ to show the contrary, the people that know him longest and best speak the loudest in terms of his character.

Filed as Exhibit D are approximately 40 letters of support written by his 10-year old son, his wife, his mother, other relatives and dozens of friends who have known him as a kind man, always willing to help the people closest to him.

THE SEVERO LAW FIRM

70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

2. <u>The Kinds Of Sentence And The Sentencing Range Established For The Offenses</u>

Except for the convictions for bank fraud, 18 U.S.C. § 1344, the sentences for all other Class C through Class E felonies range from probation to 20 years maximum.   18 U.S.C. § 1344 carries a maximum of 30 years.

3. <u>Need for Sentence Imposed to Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.</u>

Section 3553(a)(2) provides the four sentencing objectives thus:

(2) the need for the sentence imposed--(A) [RETRIBUTION] to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;(B) [DETERRENCE] to afford adequate deterrence to criminal conduct;(C) [INCAPACITATION] to protect the public from further crimes of the defendant; and(D) [REHABILITATION] to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner....

a.    RETRIBUTION.   While Mr. Darbinyan's conduct, as alleged and found by the jury, is certainly serious, it cannot be said to be the most serious offense conduct among the entire ambit of fraud offenses.   Yet, the 32-year recommendation ranks high among sentences imposed in the entire spectrum of fraud cases.   Considering that the life expectancy of a white American living in California is 77.12 years, Defendant's suggested 120-month sentence is about 13% of his life.    That much time is unquestionably "sufficient but not greater than necessary" to accomplish this sentencing objective.

b.   DETERRENCE.   It is beyond dispute that a 120-month sentence should serve as a deterrent to anyone who even entertains the conduct for which defendant stands convicted.

c.   INCAPACITATION.    Here again, 10 years of imprisonment quite adequately accomplishes the incapacitation objective.

d. REHABILITATION.  A 120-month period of incarceration should allow

defendant to better educate himself.

4.   <u>Avoid Unwarranted Sentencing Disparity</u>.

The defendants in this case presented varying degrees of criminal records and offense conduct.  Certainly, parity among defendants is a laudable and desirable goal. First, "A sentence outside the applicable advisory guidelines range is not per se unreasonable when it is based on the district court's efforts to achieve sentencing parity between codefendants who engaged in similar conduct, where some defendants were properly subject to a sentencing enhancement, and others were not."  *U.S. v. Tankersley* (9th Cir. 2008) 537 F.3d 1100.

In this case, the median sentences involving the fraud counts ranged between 24 and 48 months.  Specifically, Andranik Aloyan (Defendant #27), a co-defendant in this case whose loss was found to be approximately $7 million, received a 160-month sentence.

In *United States v. Treadwell*, 593 F.3d 990, 992-93 (9th Cir. 2010), the indictment alleged that defendant, along with others including their attorney, were involved in an extravagant four-year Ponzi scheme that ultimately defrauded investors out of more than *$40 million*.   After conviction, the court sentenced Mr. Treadwell to 300 months in prison.

Andranik Backchadjian, a co-defendant (#40), with a loss of over $1 million, and 10 criminal history points, was sentenced to 110 months.

Emil Airapetian, a co-defendant (#7), who is responsible for kidnapping Minas Matosyan, placing him in a vehicle and threatening him with a firearm, was sentenced to 46 months imprisonment.

Raymond Tarverdyan, a co-defendant (#24), whom the government has characterized as "the next most culpable" in the 99-Cents Stores scheme, and who has 13 criminal history points has yet to be sentenced but the government is recommending a 121-month sentence.

In all of the instances where defendants in this case have been sentenced, the

THE SEVERO LAW FIRM
70 S. LAKE AVENUE, STE. 945 ♦ PASADENA, CA 91101

amount of loss and number of victims have been erroneously calculated, as noted in defendant's argument, above.

In Mr. Darbinyan's case, with a proper application of the guidelines, a sentence of 120 months would achieve parity in sentencing.

### 4.   CONCLUSION

For all the foregoing reasons, defendant Mher Darbinyan respectfully requests that this court sentence him to a term of imprisonment not to exceed 120 months, 3 years supervised release and such other terms and conditions as are just and proper.

Dated:  October 31, 2014                    THE SEVERO LAW FIRM

By____/s/ _Michael V. Severo_____

Michael V. Severo
Attorney for Defendant